**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 13 |
| Brittany Ebson, | : | |
| Debtor. | : | Bankruptcy No.  19-16576-MDC |

# **MEMORANDUM**

### I.   INTRODUCTION

Pending before the Court for disposition is the objection (the "Claim Objection") of Brittany Ebson (the "Debtor") to the proof of claim filed by BMW Financial Services NA, LLC ("BMW," and together with the Debtor, the "Parties").  For the reasons set forth herein, the Court will overrule the Claim Objection, and BMW's claim will be allowed in full.

### II.   RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

On December 27, 2019, BMW filed a proof of claim (the "Proof of Claim") in the Debtor's bankruptcy case, asserting an unsecured claim in the amount of $26,224.25, based on a lease (the "Lease") with the Debtor for a 2019 BMW 530xi sedan (the "Vehicle").[1]  On November 4, 2021, the Debtor filed the Claim Objection.[2]  On November 19, 2021, BMW filed a response to the Claim Objection (the Response").[3]  On January 18, 2022, BMW amended the Proof of Claim (the "Amended Proof of Claim"),[4] asserting an unsecured claim of $11,120.76 based on the "Deficiency Balance" under the Lease.

---

[1] Claim No. 8-1.

[2] Bankr. Docket No. 174.

[3] Bankr. Docket No. 184.

[4] Claim No. 8-2.

On February 1, 2022, in advance of an evidentiary hearing on the Claim Objection and the Response, BMW filed a joint stipulation of undisputed facts (the "Stipulation of Facts").[5] On February 2, 2022, the Court held an evidentiary hearing (the "Hearing") on the Claim Objection and the Response. At the conclusion of the Hearing, the Court took the matter under advisement.

## III. DISCUSSION

The amount BMW initially sought by the Proof of Claim, filed in December 2019, represented the remaining monthly payments due under the Lease at the time the Debtor filed for bankruptcy, plus a late charge of $139.25.[6] At the time BMW filed its original Proof of Claim, the Debtor remained in possession of the Vehicle. The Debtor testified at the Hearing, however, that she subsequently surrendered the Vehicle on May 15, 2021, to a BMW dealership (the "Dealership").[7] On January 10, 2022, the Vehicle was thereafter auctioned and sold for $36,300.00 (the "Realized Value").[8]

BMW's Amended Proof of Claim, filed after the Vehicle was auctioned and sold, credited the Debtor for the Realized Value of the Vehicle against the adjusted lease balance of $35,356.90, as required under the terms of the Lease.[9] After doing so, BMW asserted a claim for other amounts allegedly due under the terms of the Lease totaling $11,120.76.[10]

The Parties dispute the value of the Vehicle, as well as the date on which that valuation should be calculated. The Debtor takes the position that the proper valuation of the Vehicle is

---

[5] Bankr. Docket No. 230.
[6] Stipulation of Facts at ¶11.
[7] The dealership was BMW of Fort Washington. Stipulation of Facts at ¶26.
[8] Stipulation of Facts at ¶35.
[9] See BMW Ex. 1, at ¶23(e).
[10] *Id.* at ¶37.

$42,000.00, valued as of the date it was surrendered, *i.e.,* May 15, 2021 (the "Surrender Date").[11] BMW, by contrast, argues that the proper valuation of the Vehicle is $36,300.00, *i.e.,* the Realized Value obtained when the Vehicle was auctioned and sold on January 10, 2022.[12]

The valuation of the Vehicle is the basis for the Debtor's objection to the Amended Proof of Claim.[13] The Debtor objects to the Amended Proof of Claim on the basis that BMW's sale of the Vehicle was not commercially reasonable, resulting in a depressed Realized Value. Because that Realized Value operates as a credit to the Debtor under the Lease, the Debtor asserts the Amended Proof of Claim overstates the amount to which BMW is entitled. The Debtor argues that the value of the Vehicle as of the Surrender Date was at least equal to, if not more than, the remaining amounts the Debtor owed-s under the terms of the Lease.[14]

At the Hearing, the Debtor relied on several sources in attempting to establish that the sale of the Vehicle was not commercially reasonable and suffered a depressed value. The Debtor called Khaled Malik ("Mr. Malik"), the General Sales Manager at Concordville Subaru, as a purported expert witness on appraising car values.[15] As will be discussed *infra*, however, Mr. Malik's testimony was not entirely consistent with the Debtor's position that the Vehicle should be valued as of the Surrender Date. Rather, at different points in his testimony, Mr. Malik stated

---

[11] Stipulation of Facts at ¶40.

[12] *Id.* at ¶41.

[13] Although the Debtor did not amend its Claim Objection based on the Amended Proof of Claim, counsel for the Debtor confirmed at the Hearing that this is the basis for the Claim Objection. Hearing Audio Recording, at 1:12 to 1:13 p.m. The Debtor is not contesting the elements of the Amended Proof of Claim other than the credit given for the Realized Value. Hearing Audio Recording, at 1:25 p.m.

[14] *Id.*

[15] Counsel for the Debtor questioned Mr. Malik regarding his professional background that qualified him to testify as an expert, but he was not formally offered as an expert at the conclusion of that testimony. Hearing Audio Recording at 1:47 p.m.

that his opinion of the Vehicle's value was as of (a) the Surrender Date, (b) the time between when the Debtor's petition was filed in 2019 and the Surrender Date, and (c) the approximate date the Vehicle was auctioned and sold.

At the outset of his examination Debtor's counsel asked Mr. Malik what the estimated *range* of value for the Vehicle was from October 21, 2019, *i.e.,* the Petition Date, through the Surrender Date.[16] Mr. Malik testified that there is no "floating appraisal" but that the value was "somewhere in the 40s."[17] The Court is not clear what Debtor's counsel intended to establish by asking for a range of value between the Petition Date and the Surrender Date, but finds this inquiry and valuation unhelpful where the Parties assert the operative date for valuation is either the Surrender Date or the date the Vehicle was sold.

Mr. Malik then testified regarding two exhibits (the "Valuation Exhibits"): (a) the Vehicle's CARFAX Report, which was Debtor's Exhibit 2, and (b) the Manheim Market Report, which was Debtor's Exhibit 3, and which the Stipulation of Facts states "lists the prices of vehicles sold at auction in the Northeast Region over the periods [of] times listed in the report."[18] Mr. Malik testified that, based on his review of the Valuation Exhibits, he believed the value of the Vehicle on the Surrender Date of May 15, 2021 was approximately $42,480.[19] Confusingly, however, Mr. Malik also testified that he used comparisons reflected in the Manheim Market

---

[16] Hearing Audio Recording at 1:49 p.m.

[17] *Id.*

[18] Stipulation of Facts at ¶45.

[19] Hearing Audio Recording at 1:55. This valuation aligns with the Debtor's argument that the Vehicle should be valued as of the Surrender Date, as opposed to the value range Mr. Malik was asked for earlier in his testimony, discussed *supra.*

Report to determine the current market value of the Vehicle within the "past 30 to 60 days."[20] When the Court pressed Mr. Malik if he knew the value of the Vehicle as of the Surrender Date, he testified that there was "no way … to determine what the market was back then," and that his appraisal reflects his opinion of the Vehicle's value as of December 2021 to January 2022.[21]

The Court believes there are numerous problems with the Debtor's reliance on Mr. Malik's valuation testimony. First, Debtor's counsel asked Mr. Malik if his opinion was that the Vehicle's value was $42,480 "retail value."[22] The Realized Value of the Vehicle upon its sale, however, was not the retail value; it was the value attained at an auction. That is not the same as retail value, which presumably would be higher given the winning bidder's desire to sell the Vehicle for more than what was paid for it at auction. Whether Debtor's counsel's reference to the retail value of the Vehicle was unintentional or not, the testimony from Mr. Malik was that the retail value of the Vehicle was $42,480, which is not the measure of value relevant to whether BMW's auction and sale of the vehicle for the Realized Value was commercially reasonable.

The far more problematic issue is that the Debtor has argued the Vehicle should be valued as of the Surrender Date, but her own expert testified that he could not provide that value. When the Court asked Mr. Malik what his valuation of the Vehicle was as of the Surrender Date, he responded that he could not determine that value. Although the Court does not understand why Mr. Malik would not have been able to perform the same valuation analysis for May 2021

---

[20] *Id.* at 2:05 p.m.

[21] *Id.* at 2:05 to 2:06 p.m. This obviously is inconsistent with his prior testimony that his valuation was as of the Surrender Date, which the Court attributes to imprecise and confusing questioning that failed to establish with clarity on what basis and as of what date Mr. Malik's appraisal was based.

[22] *Id.*

that he used to determine his opinion of the current market value (*i.e.*, by referencing sale prices of similar vehicles at auction in the May 2021 timeframe), it is likewise perplexing as to why the Debtor believes the Court should rely on a valuation figure from Mr. Malik that does not correspond to the Debtor's valuation thesis.

Mr. Malik also conceded that the Vehicle is not included in the Manheim Market Report, despite it having been sold at auction by Manheim within the date range reflected in the report.[23] The Court finds this concerning, given Mr. Malik's testimony that all sales must be included in the report.[24] This leads the Court to question whether it accurately reflects all sales of comparable vehicles during the date range in question.[25] To the extent the report fails to include all sales during the relevant time period, its reliability as an indicator of the Vehicle's value is diminished. Notwithstanding that concern, however, the Court notes Mr. Malik's testimony that he believed the sale prices of the vehicles listed in the report would be consistent with a commercially reasonable sale of a vehicle similar to the Debtor's Vehicle.[26] Those sale prices range from $35,400 to $42,000, a range in which the Realized Value squarely falls, supporting the conclusion that the Realized Value *is* commercially reasonable, rather than that it is not.

Furthermore, Mr. Malik conceded that he had never seen the Vehicle.[27] Without having seen the Vehicle's condition at the time of the Sale, the Court believes Mr. Malik's appraisal

---

[23] *Id.* at 1:54 p.m.

[24] *Id.* at 2:00 p.m.

[25] Mr. Malik admitted that, given the Vehicle's absence, it was possible the report did not capture all relevant sales. *Id.* at 2:11 p.m.

[26] *Id.* at 2:01 p.m.

[27] *Id.* at 2:01 p.m.

lacks some degree of foundation with respect to a key indicator of value.[28] This is notwithstanding the Debtor's testimony that the condition of the Vehicle was "excellent" at the time it was surrendered. Mr. Malik did not testify as to his understanding of the condition of the Vehicle in arriving at his valuation, and the fact that the Vehicle is not listed in the Manheim Market Report, and therefore does not have an independent "Condition Report" on which Mr. Malik could have relied, leads to the conclusion that his appraisal did not account for the actual condition of the Vehicle when sold.

Finally, Mr. Malik testified that based on his own experience with surrendered leased vehicles, the gap in time from the Surrender Date to January 10, 2022, when it was sold at auction, was months too long and resulted in the Vehicle's depreciation.[29] BMW introduced the testimony of Christopher Dick ("Mr. Dick"), Special Accounts Team Leader at BMW, regarding BMW's process in repossessing the Vehicle. Mr. Dick testified that the Debtor did not contact BMW to advise that she had surrendered the Vehicle,[30] and BMW only learned that it had been surrendered after obtaining relief from the automatic stay and "pinging" the vehicle on October 4, 2021, at which point it learned that the Vehicle was located at the Dealership.[31] BMW then

---

[28] *Id.* at 1:33 p.m.

[29] *Id.* at 1:56 to 1:57 p.m. Mr. Malik likewise testified that the value would have depreciated between October 2019, when the Debtor filed her petition, and January 2022, when the Vehicle was sold. *Id.* The Court does not understand the relevance of that testimony, however, if the Debtor's contention is that the Vehicle lost value between the Surrender Date and the date it was sold. Any depreciation the Vehicle suffered prior to the Surrender Date has no bearing on whether BMW disposed of it in a commercially reasonable manner after the Surrender Date.

[30] This is consistent with the Debtor's testimony that she surrendered the Vehicle to the Dealership but did not advise BMW that she had done so. Hearing Audio Recording, at 1:35 p.m.

[31] *Id.* at 2:41 to 2:42 p.m.

took action to recover the Vehicle.[32] On cross-examination, Debtor's counsel sought to establish BMW as the party responsible for the delay between the Surrender Date and the date the Vehicle was sold because it had neither inquired with the Debtor's counsel as to the location of the vehicle nor pinged it prior to October 4, 2021, but Mr. Dick testified that (a) BMW relies on customers to advise that they had surrendered their vehicle, (b) BMW monitors bankruptcy cases but does not reach out to debtors' counsel to determine the location of leased vehicles, and (c) BMW has policies for when it pings a vehicle, and only does so once it is attempting to recover a vehicle.[33]

        The Court finds the Debtor's argument that BMW is responsible for any depreciation the Vehicle suffered between the Surrender Date and the date it was sold unfounded, if not disingenuous. The Debtor surrendered the Vehicle to the Dealership on May 15, 2021, but did not advise BMW she had done so.[34] On June 2, 2021, the Debtor filed her proposed Fifth Amended Plan,[35] which did not identify the Vehicle as having been or being surrendered, just as the Fourth Amended Plan filed on May 5, 2021 had not.[36] In fact, the Debtor's Third Amended Plan, filed on November 4, 2020, indicated that the Debtor intended to cure her default under the Lease and maintain payments.[37] Not until the Debtor filed her Sixth Amended Plan on July 14, 2021, did she state her intention to surrender the Vehicle (or perhaps indicate that she had done

---

[32] *Id.* at 2:42 p.m.

[33] *Id.* at 2:44 p.m.

[34] The Court appreciates that the Debtor may not have been aware of the difference between the Dealership and BMW, but nonetheless her failure to notify BMW that she surrendered the Vehicle resulted in a delay in BMW learning of that fact.

[35] Bankr. Docket No. 149.

[36] Bankr. Docket No. 142.

[37] Bankr. Docket No. 114.

so).[38] Therefore, in monitoring the Debtor's bankruptcy case, BMW was not on even constructive notice that the Debtor had or would surrender the Vehicle until mid-July. Moreover, when BMW filed a motion for relief from stay (the "Stay Relief Motion") on September 2, 2021, to recover the Vehicle,[39] given the Debtor's plan calling for its surrender, the Debtor did not file a response, nor evidently reach out to BMW to advise that the Vehicle had already been surrendered. Instead, BMW was forced to wait until the objection deadline had expired to file a Certificate of No Response, after which an Order granting the relief sought was entered.[40] Mr. Dick testified that after that relief was granted, BMW pinged the Vehicle, determined its location, and recovered it for sale. In the Court's view, given the Debtor's failure to advise BMW she had surrendered the Vehicle, failure to identify the Vehicle as subject to surrender in the Fifth Amended Plan filed weeks after the Surrender Date, and failure to respond to the Stay Relief Motion or advise BMW that the Vehicle had already been surrendered, she has no grounds to argue that BMW unreasonably delayed the sale of the Vehicle while those events played out, resulting in the Vehicle's alleged depreciation.[41]

## IV.    CONCLUSION

For the reasons discussed above, the Claim Objection will be overruled, and the Amended Proof of Claim will be allowed in full. An order consistent with this Memorandum

---

[38] Bankr. Docket No. 154.

[39] Bankr. Docket No. 165.

[40] Bankr. Docket Nos. 167, 171.

[41] Ironically, in paragraph 43 of the Stipulation of Facts, the Debtor stipulated that Mr. Malik would testify that "in his professional experience, the value of used vehicles at the time the Debtor surrendered her vehicle through present day have *increased* due to a nationwide shortage of new cars as a result of global supply shortages." Stipulation of Facts, at ¶43 (emphasis added). This stipulated fact would suggest that even had BMW been guilty of "slow walking" the sale of the Vehicle, any resulting delay would have *benefitted* the Debtor because vehicle values were increasing over time.

will be issued.

Dated: February 22, 2022

MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE

Erik B. Jensen, Esquire
Jeffrey M. Carbino, Esquire
Jensen Bagnato, PC
1500 Walnut Street, Suite 1510
Philadelphia, PA 19102

Jason B. Schwartz, Esquire
Mester & Schwartz, P.C.
1917 Brown Street
Philadelphia, PA 19130

Kenneth E. West, Esquire
Chapter 13 Standing Trustee
1234 Market Street, Suite 1813
Philadelphia, PA 19107

United States Trustee
Custom House
200 Chestnut Street, Suite 502
Philadelphia, PA 19106